UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| LORING JUSTICE, *individually and as* *Next of Friend of N.N./N.J., a minor*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.: 3:19-CV-185 |
| MARTHA MEARES, PAUL DILLARD, MEARES AND DILLARD, and MEARES AND ASSOCIATES, | ) ) ) ) | Judge Curtis L. Collier Magistrate Judge Debra C. Poplin |
| Defendants. | ) ) | |

**M E M O R A N D U M**

Before the Court is a motion for judgment on the pleadings by Defendants Martha Meares, Paul Dillard, Meares & Dillard, and Meares & Associates (collectively, "Defendants"). (Doc. 59.) Plaintiff Loring Justice has responded in opposition (Doc. 63), and Defendants have filed a reply (Doc. 64). For the reasons below, the Court will **GRANT** Defendants' motion (Doc. 59).

I.   **BACKGROUND**

The following summary of the facts accepts all factual allegations in Plaintiff's Amended Complaint (Doc. 46) as true. *See Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Plaintiff and Kim Nelson have a son, "N," together. Plaintiff and Nelson have been in litigation in state court over custody and visitation of N since at least 2004. This case arises from the alleged conduct of Nelson and her three attorneys—David Valone, Martha Meares, and Paul Dillard—during the dispute.

## A. The State-Court Custody Dispute

The most recent state-court custody case between Plaintiff and Nelson began in or around 2012. At the start of the dispute, Nelson was the Clerk of the Circuit and Juvenile Courts of Roane County.

On or about August 23, 2013, Valone filed an emergency petition for an injunction on Nelson's behalf. The petition claimed Plaintiff represented a danger to N unless Plaintiff's parenting time was on a strictly supervised basis. On September 3, 2013, the state court granted the emergency petition orally at a hearing on the motion and subsequently issued a written order on September 13, 2013. On September 24, 2013, the state court granted permission for Plaintiff to file an interlocutory appeal of the petition. The court asked Plaintiff to file a proposed order and statement of reasons to that effect, which he did. The judge later rejected Plaintiff's proposed order.

In 2014, a condition was imposed on Plaintiff that required him to see a family therapist in order to see N on an unsupervised basis. A state-court judge gave Nelson the sole authority to choose the family therapist for Plaintiff to see, and the court appointed Dr. Nancy Brown at Nelson's request. Nelson later opposed Dr. Brown's appointment, and Dr. Brown was eventually dismissed. Dr. Brown testified that Valone told her to not express opinions in favor of Plaintiff or against Nelson and that she should not say anything to antagonize the judge. Meares allegedly threatened Dr. Brown in an attempt to influence her testimony. The subsequent therapist, also chosen by Nelson, was Dr. Thomas Hanaway, but he likewise left the case after some time. Dr. Hanaway later indicated he left because he was afraid of angering Nelson and was intimidated by Valone and Meares.

2

The custody dispute was scheduled for trial in August 2016, and the parties engaged in settlement negotiations until the hours leading up to trial. During those negotiations, Defendants offered Plaintiff unsupervised parenting time with N. Additionally, Defendants allegedly offered Plaintiff even more unsupervised parenting time if he paid them $400,000. Plaintiff agreed. A proposed settlement order incorporated the agreed-upon terms, describing the $400,000 as $200,000 for attorney fees and $200,000 in child-support arrearages. At that time, no child-support arrearages were outstanding. The trial was postponed due to the settlement negotiations. On August 14, 2016, at Defendants' request, Plaintiff furnished a $200,000 cashier's check to see N unsupervised. Plaintiff was able to see N unsupervised for a short time until the settlement negotiations broke down.

The case went to trial in early 2017. Defendants maintained that Plaintiff should not be permitted to have unsupervised parenting time with N. Specifically, on February 21, 2017, Nelson testified that she never felt comfortable enough to allow Plaintiff unsupervised parenting time with N. This testimony conflicted with both the previous offer of unsupervised parenting time and the terms of the proposed settlement order.

On the last day of trial, March 29, 2017, Defendants submitted affidavits in support of a request for attorney fees. The affidavits allegedly conflicted with prior testimony as to the amount of attorney fees Nelson had accumulated at that time and included duplicative entries and entries for work not directly related to the dispute. On April 11, 2017, the court found Nelson had accrued $375,000 in attorney fees. In May 2017, Defendants moved for discretionary costs. However, the requested costs included costs not recoverable under Tennessee law. Nelson also was awarded appellate attorney fees. In support of those fees, Defendants submitted documentation that included duplications and fees for non-existent filings.

On October 18, 2019, the state court issued a sanctions order against Plaintiff. On or about November 19, 2019, Plaintiff filed a motion to alter or amend the sanctions order under the Tennessee Rules of Civil Procedure, explaining that the sanctions were improperly imposed. Before the sanctions order became final, Defendants used the order to file a lien against Plaintiff's real property in Knoxville, Tennessee. On January 13, 2020, the state court granted Plaintiff's motion to alter or amend and removed all sanctions against Plaintiff.

## B.     Procedural History

On May 21, 2019, Plaintiff filed this lawsuit against Nelson, Valone, the Law Office of David Valone, and Defendants. (Doc. 1.) On February 19, 2020, upon Plaintiff's request, the Court granted Plaintiff leave to file an amended complaint. (Doc. 45.) The Amended Complaint asserts twelve counts: (1) extortion, attempted extortion, and conspiracy to commit extortion; (2) intentional infliction of emotional distress; (3) tortious and attempted interference with parental rights; (4) civil conspiracy; (5) coercion, duress, or undue influence; (6) abuse of process and conspiracy to abuse process; (7) fraud and conspiracy to commit fraud; (8) blackmail and conspiracy to commit blackmail; (9) civil remedies under the Racketeer Influenced and Corrupt Organizations Act ("RICO")[1]; (10) violation of civil rights under 42 U.S.C. § 1983; (11) conspiracy to interfere with civil rights under 42 U.S.C § 1985(2); and (12) conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3). (Doc. 46.)

On November 24, 2020, the Court dismissed Plaintiff's claims against Nelson, Valone, and the Law Office of David Valone pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 56, 57.) As a result, Plaintiff's only remaining claims are against Defendants.

---

[1] The Court previously ordered Plaintiff to file a case statement for the fraud predicate offenses alleged under RICO (Doc. 35), with which Plaintiff complied (Doc. 37).

4

Defendants move for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on four grounds.[2] (Doc. 59.) First, Defendants argue the claims against them should be dismissed under the *Rooker-Feldman* doctrine because the case is a collateral attack on a state-court judgment. (Doc. 60 at 19–22.) Second, they argue Rule 408 of the Federal Rules of Evidence ("Rule 408") bars Plaintiff's claims arising from the custody dispute's settlement discussions. (*Id.* at 23–24.) Third, Defendants contend the claims against them should be dismissed based on the litigation privilege, which protects the conduct of attorneys acting within the scope of their representation. (*Id.* at 22–23.) Fourth, they assert Plaintiff's claims should be dismissed for failure to state a claim for relief. (*See generally id.*)

Plaintiff has filed a response in opposition to Defendants' motion. (Doc. 63.) Plaintiff asserts the *Rooker-Feldman* doctrine does not apply because Plaintiff is neither appealing nor asking the Court to enjoin the enforcement of the state court's decision. (*Id.* at 21–22.) He also argues Rule 408 does not bar his claims because it does not protect extortionate threats. (*Id.* at 16–19.) Plaintiff also asserts Defendants are not protected by the litigation privilege. (*Id.* at 4–5, 9–12.) Finally, Plaintiff explains how he has stated a claim upon which relief can be granted for each claim against Defendants.[3] (*See generally id.*)

---

[2] Defendants also argue Plaintiff has failed to state any claim against Dillard, as the factual allegations against him are vague. (Doc. 60 at 17–18.) In the interest of efficiency, the Court will address whether Plaintiff has stated any claim for relief against Defendants collectively and, if any claims remain thereafter, will consider individual allegations against Dillard.

[3] Plaintiff also argues Defendants had independent duties to him. (Doc. 63 at 12–15.) However, it is unclear to which claims this argument refers to or relates, and the existence of independent duties is not an element of any of Plaintiff's claims.

5

## II.    **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 12(c), a party may move for a judgment on the pleadings after the pleadings are closed, but early enough not to delay trial. The standard of review for a motion on the pleadings is the same standard applied in a motion to dismiss under Federal Rule of Civil Procedure 12(b). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). A court must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true. *Coley v. Lucas Cnty, Ohio*, 799 F.3d 530, 537 (6th Cir. 2015). In addition, all ambiguities must be resolved in the plaintiff's favor. *Carter by Carter v. Cornwell*, 983 F.2d 52, 54 (6th Cir. 1993) (citing *Jackson v. Richards Med. Co.*, 961 F.2d 575, 577 (6th Cir. 1992)). Bare legal conclusions, however, need not be accepted as true. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The defendant bears the burden of showing that the complaint has not stated a claim for relief. *Coley*, 799 F.3d at 537. To survive a motion on the pleadings, a complaint must present sufficient facts which, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when there are sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether the complaint satisfies facial probability, a court must "draw on its judicial experience and common sense." *See id.* at 679.

## III.    **DISCUSSION**

The Court first will address Defendants' arguments for blanket dismissal of Plaintiff's claims concerning the *Rooker-Feldman* doctrine, Rule 408, and the litigation privilege. The Court then will analyze Plaintiff's individual causes of action.

6

## A.     *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine arises from two Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  In *Rooker*, the Supreme Court agreed with a federal court's decision to decline to exercise jurisdiction over a petition requesting a state-court judgment be declared null and void. 263 U.S. at 414–15.  The Supreme Court explained:

> [I]t was the province and duty of the state courts to decide [the constitutional questions]; and their decision, whether right or wrong, was an exercise of jurisdiction. If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding.
> . . .
> [N]o court of the United States other than this court could entertain a proceeding to reverse or modify the judgment for errors of that character.

*Id.* at 415–16.  In *Feldman*, a district court had declined to review a state court's decision on bar-admission matters.  460 U.S. at 463.  The Supreme Court agreed with the district court's interpretation of its jurisdictional reach, finding "the United States District Court is without authority to review final determinations of the District of Columbia Court of Appeals in judicial proceedings." *See id.* at 476.

Together, *Rooker* and *Feldman* stand for the proposition that federal district courts cannot review claims "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced . . . ." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also In re Sun Valley Foods Co.*, 801 F.2d 186, 189 (6th Cir. 1986) (internal quotations omitted) ("A United States district court has no authority to review final judgments of a state court in judicial proceedings. . . . This is true, even though the state court judgment may have been erroneous.").  To determine whether the *Rooker-Feldman* doctrine applies, a court must look to "the source of the injury" alleged.

7

*McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). "If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id.*

Defendants argue Plaintiff's claims hinge on the decisions of the Tennessee state courts and essentially seek to revisit those decisions, thereby triggering the *Rooker-Feldman* doctrine. (Doc. 60 at 19–22.) In response, Plaintiff asserts the doctrine does not apply because his claims do not implicate the merits of the state courts' decisions, but rather the conduct and proceedings leading to those decisions. (Doc. 63 at 21–22.)

Plaintiff's allegations are based on Defendants' conduct during the state-court dispute. Plaintiff does not ask the Court to evaluate or reverse the decisions of the state court. Rather, Plaintiff alleges Defendants engaged in a course of conduct during those state proceedings that give rise to his claims in this case. As a result, the source of the injury is not the state-court decision, but rather Defendants' actions during the state-court proceedings. Thus, the *Rooker-Feldman* doctrine does not bar the Court from deciding this matter.

### B.   Federal Rule of Evidence 408

Rule 408 prohibits parties from seeking "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction" by offering evidence of

> (1) furnishing, promising, or offering – or accepting, promising to accept, or offering to accept – a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408(a). However, evidence does not violate Rule 408 if offered for another purpose, "such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b). Likewise, Rule 408 does not shield wrongful acts committed during compromise negotiations simply because they occur during negotiations. *See Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997). "Evidence of the compromise of a claim different than the claim currently in dispute therefore is admissible unless 'the compromise evidence requires an inference as to the offeror's belief concerning the validity or invalidity of the compromised claim.'" *Id.* at 1294 (alteration omitted) (quoting 23 *Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence* § 5308 (1st ed. 1980)).

Defendants contend offers of settlement or compromise are not admissible on issues of liability under Rule 408 and therefore cannot serve as the bases for several of Plaintiff's claims. (Doc. 60 at 23–24.) In response, Plaintiff claims extortionate threats during negotiations are not protected under Rule 408, making Defendants' statements admissible for their offered purpose. (Doc. 63 at 4, 22–25.)

The statements at issue are those of Defendants during settlement negotiations in the state-custody dispute. Specifically, Plaintiff alleges Defendants offered Plaintiff unsupervised parenting time with N if Plaintiff paid $400,000. Plaintiff argues these statements demonstrate extortion, among other legal wrongs. As a result, Plaintiff's allegations do not require an inference as to the parties' beliefs regarding the validity or invalidity of their claims in the custody dispute. *See Uforma*, 111 F.3d at 1294. Thus, Rule 408 does not bar Plaintiff's claims arising from settlement negotiations in the child-custody dispute.

9

## C.     Litigation Privilege

The litigation privilege under Tennessee law provides absolute immunity from suit for attorneys' defamatory communications during litigation and certain communications before litigation. *Simpson Strong-Tie Co., Inc. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 26–27 (Tenn. 2007). Traditionally, the Tennessee Supreme Court has recognized the litigation privilege only in defamation suits. *See id.* at 24–25. However, other courts in Tennessee have recognized the litigation privilege beyond the defamation context. *See Unarco Material Handling, Inc. v. Liberato*, 317 S.W.3d 227, 238–39 (Tenn. Ct. App. 2010) (applying litigation privilege to claim of intentional interference with contract); *McWilliams v. Noel*, No. 12-3089-JDT-dkv, 2013 WL 5409887, at *9–10 (W.D. Tenn. Sept. 25, 2013) (applying Tennessee litigation privilege to allegations of due-process violations); *Rajapakse v. Baker Donelson Bearman Caldwell & Berkowitz, P.C.*, No. 13-2328-JDT-DKV, 2013 WL 3992523, at *10 (W.D. Tenn. Aug. 5, 2013) (applying Tennessee litigation privilege to state-law claims).

The Court need not determine whether the litigation privilege extends to the claims asserted in this case because, regardless, the litigation privilege does not apply if the attorney engaged in wrongful conduct. *See Simpson Strong-Tie Co.*, 232 S.W.3d at 24 (holding the litigation privilege requires "the attorney act[ed] in good faith"); *Uncarco*, 317 S.W.3d at 238 (holding, as to a claim of tortious interference with contract, "the conduct [of an attorney] shall not be privileged if the attorney employed wrongful means"); *Pagliara v. Johnson Barton Proctor & Rose, LLP*, No. 3:10-cv-679, 2010 WL 3940993, at *9 (M.D. Tenn. Oct. 6, 2010) (discussing *Uncarco*'s holding as "limit[ing] the [litigation] privilege to situations in which a lawyer did not employ 'wrongful means,' including fraud"). Here, Plaintiff argues Defendants are not entitled to the litigation privilege because their conduct involved extortionate acts, abuse of process, and other wrongs.

10

(Doc. 63 at 4.) Specifically, Plaintiff has alleged Defendants sought payment for fees and costs Plaintiff did not owe. (Doc. 46 ¶¶ 176, 182, 184, 194.) Further, Plaintiff's Amended Complaint includes an allegation of Meares's coercion of a witness. (*Id.* ¶ 165.) Any of these acts, if true, would constitute wrongful conduct. *See Uncarco*, 317 S.W.3d at 238 ("In this context, wrongful means includes, *inter alia*, fraud, trespass, threats, violence, or other criminal conduct."). Accordingly, while Plaintiff's allegations against Defendants involve and are directly related to their conduct as Nelson's attorneys, Plaintiff has plausibly alleged they engaged in wrongful conduct.[4] Thus, the litigation privilege does not shield Defendants from liability.

Having considered Defendants' broader arguments for dismissal, the Court next considers whether Plaintiff's specific causes of action state claims on which relief can be granted. The Court begins with Plaintiff's federal causes of action and then considers Plaintiff's state-law claims.

### D. Civil Rico Claims

RICO criminalizes conducting business through a pattern of racketeering activities and provides a civil cause of action for individuals injured by racketeering activity. 18 U.S.C. §§ 1962, 1964. While RICO "is a criminal statute, an injured party can bring a civil RICO claim against parties who violate any subsection of § 1962." *Courser v. Mich. H.R.*, 831 F. App'x 161, 185 (6th Cir. 2020).

Plaintiff has asserted RICO claims under both § 1962(c), which addresses a pattern of racketeering activity, and § 1962(d), which addresses a RICO conspiracy. (Doc 46 ¶¶ 395–510; *see also* Doc. 37.) The Court will consider the two subsections in turn.

---

[4] Broad allegations of Defendants' wrongful conduct, while sufficient to overcome the litigation privilege, do not necessarily state plausible claims as to Plaintiff's individual causes of action for extortion, abuse of process, blackmail, coercion, and fraud as discussed further below.

11

### 1.    18 U.S.C. § 1962(c)

Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim under § 1962(c), a plaintiff must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

Defendants argue Plaintiff has failed to state a claim under § 1962(c) because he has not alleged sufficient predicates acts to demonstrate a pattern of racketeering activity. (Doc. 60 at 11–13.) The Court agrees.[5]

To show a pattern of racketeering activity, a plaintiff must allege an enterprise engaged in at least two predicate acts of racketeering activity. *Moon*, 465 F.3d at 723. "Racketeering activity" is defined by 18 U.S.C. § 1961(1), and it is an exclusive list of the acts constituting racketeering activity. *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993) (explaining "only those acts itemized in 18 U.S.C. § 1961(1) can constitute predicate offenses for RICO violations"). Plaintiff argues he has plausibly alleged predicate acts of extortion, coercion, blackmail, fraud, obstruction of justice, trafficking, mail fraud, and wire fraud. (Doc. 63 at 18–19 (citing Doc. 37 (RICO Case Statement); Doc. 46 ¶¶ 395–510).)

---

[5] Defendant also argues Plaintiff failed to allege an enterprise, pattern, and injury. (Doc. 60 at 9–14.) The Court need not address those arguments as Plaintiff's § 1962(c) claims fails based on his failure to allege a pattern. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).

As an initial matter, several allegations by Plaintiff cannot be predicate acts because they are excluded from § 1961(1).  First, Plaintiff's allegations of coercion, perjury, common law fraud, and false reports are not included in the list of racketeering activities and, thus, cannot constitute predicate offenses.  *See* 18 U.S.C. § 1961(1).  Second, Plaintiff's allegation that Defendants "committed obstruction of justice" is not a predicate offense.  (*See* Doc. 46 ¶ 448.)  The only obstruction offenses included in § 1961(1) are federal offenses involving influence on or injury to officers or jurors, obstruction of a criminal investigation, or obstruction of law enforcement operations, which Plaintiff's allegations do not establish.  *See* 18 U.S.C. § 1961(1) (listing only violations of 18 U.S.C. § 1503 (prohibiting the influencing or injuring of officers or jurors), 18 U.S.C. § 1510 (prohibiting obstruction of criminal investigations), and 18 U.S.C. § 1511 (prohibiting the obstruction of state or local law enforcement) as racketeering activity).

Accordingly, Plaintiff's § 1962(c) claim depends on whether his remaining allegations of trafficking, witness intimidation, mail and wire fraud, and extortion constitute at least two predicate acts.

### a.  Trafficking

Trafficking, in violation of 18 U.S.C. § 1590, is recognized as a RICO predicate offense. 18 U.S.C. § 1961(1).  Section 1590 criminalizes trafficking with respect to peonage, slavery, involuntary servitude, or forced labor, and requires allegations that the victim was trafficked "for labor or services."  18 U.S.C. § 1590.  While the statute does not define "labor or services," the Sixth Circuit has interpreted the phrase in accordance with the words' ordinary meanings.  *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015).  Labor is "expenditure of physical or mental effort esp[ecially] when fatiguing, difficult, or compulsory," and service is "the performance of

work commanded or paid for by another." *Id.* (quoting *Webster's New Int'l Dictionary* (3d ed. 1993)).

Plaintiff maintains Defendants engaged in trafficking by offering Plaintiff unsupervised parenting time with N in exchange for $400,000. (Doc. 46 ¶ 462(11).) However, the allegation does not establish how the offer involved the peonage, slavery, involuntary servitude, or forced labor of N during Plaintiff's parenting time with N. The Amended Complaint contains no allegations as to the labor or services to which N would have been subjected as the victim of the purported trafficking. While Plaintiff does allege N would have been required to spend time with Plaintiff, he does not allege such time would have required effort or work by N. Thus, the allegation of trafficking in violation of 18 U.S.C. § 1590 is not a predicate offense for Plaintiff's RICO claim.

### b.    Witness Intimidation

The only recognized predicate act for witness intimidation is the federal offense, 18 U.S.C. § 1512. *See* 18 U.S.C. § 1961(1). Under 18 U.S.C. § 1512(b), it is unlawful to "knowingly use[] intimidation, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person, with intent to . . . withhold testimony, or withhold a record, document, or other object, from an official proceeding." The definition of "official proceeding," as it appears in the statute, does not include state-court proceedings. *See* 18 U.S.C. § 1515; *Park South Assocs. v. Fischbein*, 626 F. Supp. 1108, 1113 (S.D.N.Y. 1986) (explaining 18 U.S.C. § 1512 "does not apply to state court proceedings"). Therefore, to establish a claim under § 1512(b), a plaintiff must show an individual "(1) corruptly persuade[d] (2) a witness in an official

14

*federal* proceeding (3) with the intent to influence that witness's testimony." *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002) (emphasis added).

Plaintiff's allegations of witness intimidation involve only state-court proceedings. (*See* Doc. 46 ¶¶ 471–74 (Meares's threats towards Dr. Brown); *id.* ¶ 477 (Meares's intimidation of Dr. Hanaway).) Plaintiff's claims of witness intimidation therefore cannot serve as predicate offenses, as § 1512(b) does not apply to witness intimidation in state-court proceedings.

### c.    Mail and Wire Fraud

Mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, can be predicate acts of racketeering activity under RICO. 18 U.S.C. § 1961(1). "The elements of mail and wire fraud are: (1) a scheme to defraud, and (2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999).

The first element, a scheme to defraud, requires "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 513 (6th Cir. 2010) (alteration omitted) (quoting *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984)). Intentional fraud entails "proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Advocacy Org.*, 176 F.3d at 322 (quoting *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389–90 (6th Cir. 1996)).

The second element addresses the interstate nexus requirement. The interstate nexus for mail fraud can be satisfied by use of the Postal Service. *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994) (stating "testimony as to a company's routine use of the postal service is sufficient

15

evidence on its own to establish the mailing requirement"); *see also United States v. Elliott*, 89 F.3d 1360, 1364 (8th Cir. 1996) (finding "the jurisdictional basis of the mail fraud statute is grounded in the Postal Power and therefore necessarily encompasses all items passing through the United States mails, even if their passage is purely intrastate"). As to wire fraud, use of electronic communication, including e-mail, is sufficient. *Advocacy Org.*, 176 F.3d at 322; *see also Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 803 (6th Cir. 2015) (finding "the very act of sending an e-mail creates the interstate commerce nexus necessary for federal jurisdiction," as to federal false advertising claim).

Fraud claims in a complaint also must satisfy the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9(b). To do so requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)); *see also Bender*, 749 F.2d at 1215–16 (affirming dismissal of RICO claim because plaintiff failed to allege "the time, place and contents of the misrepresentations" of mail-fraud predicate offenses).

Plaintiff asserts Paragraph 451 of his Amended Complaint includes allegations of mail and wire fraud that are predicate acts for his RICO claim. (Doc. 63 at 19.) However, the allegations in Paragraph 451 involving Defendants cannot be predicate acts of mail or wire fraud, as they do not meet the Rule 9(b) particularity requirement:

- Plaintiff alleges Meares transmitted fraudulent pleadings, filings, and affidavits on several dates without alleging what fraudulent statements the documents contained. (Doc. 46 ¶ 451(3).)
- Plaintiff alleges Meares threatened Dr. Brown in an attempt to influence her state-court testimony, but he fails to allege what statements were false or the materiality of those statements. (*Id.* ¶ 451(6).)

16

- Plaintiff alleges an email he received from a trial clerk indicated a state-court judge participated in the screening of a petition after he recused himself from the case, but he does not allege what statements in the email were false. (*Id.* ¶ 451(7).)

The only allegations of mail or wire fraud that satisfy Rule 9(b) arise from two instances: a false child-abuse report filed against Plaintiff, and the offer by Defendants to sell unsupervised parenting time with N for money. (*See id.* ¶¶ 462(2), (5), (6).) Neither constitutes mail or wire fraud.

First, Plaintiff asserts Meares engaged in wire fraud by conspiring with Nelson to file a false child-abuse report, which was made in furtherance of a scheme to extort Plaintiff to give up his custody claims and pay money for time with N. (*Id.* ¶ 462(2).) Plaintiff alleges Nelson falsely reported N had sustained "a wound, injury, disability or physical or mental condition caused by the brutality, abuse, or neglect of" Plaintiff, despite the lack of medical evidence, and Tennessee authorities found no evidence of abuse. (*Id.*)

Plaintiff's assertions related to the false child-abuse report do not sufficiently allege either element of wire fraud. As to interstate nexus, Plaintiff's only allegation of the use of wires is that Nelson "fil[ed] a false report of child abuse *via interstate wires*." (*Id.* (emphasis added).) This allegation is nothing more than a conclusory assertion, which is insufficient to state a claim for wire fraud. *See Iqbal*, 556 U.S. at 678. In addition, the false child-abuse report does not demonstrate a scheme to defraud. Plaintiff presumably knew the child-abuse report against him was false, so the filing of the report could not have been "reasonably calculated to deceive" him. *See Riverview Health Inst. LLC*, 601 F.3d at 513. In addition, Plaintiff alleges "Tennessee authorities found absolutely no evidence of any child abuse," (Doc. 46 ¶ 462(2)), meaning the scheme did not "accomplish[] the end designed." *See Riverview Health*, 601 F.3d at 513. Finally, even assuming Plaintiff's other allegations constitute a scheme to defraud, Plaintiff does not allege

17

the child-abuse report was made in furtherance of the alleged scheme, nor can the Court reasonably infer the report was part of a scheme to defraud Plaintiff by extorting money. The false report was filed well before Plaintiff alleges the extortion scheme began; it was filed in August 2012, but the earliest efforts to extract money from Plaintiff allegedly began in September 2013. Thus, Plaintiff has failed to allege the child-abuse report constituted wire fraud, so it cannot constitute a predicate act.

Second, Plaintiff asserts the offer to sell unsupervised parenting time constitutes mail and wire fraud. (Doc. 46 ¶¶ 462(5), (6).) In particular, Plaintiff argues a scheme to defraud is pleaded based on his allegations that Defendants repeatedly tried to extract money from him, sent his counsel documents "to further the extortion," and communicated with judges regarding the underlying case. (Doc. 63 at 19.)

Plaintiff has alleged the necessary interstate nexus for mail and wire fraud, as the $400,000 request was mailed via the Postal Service and emailed to Plaintiff's counsel on August 11, 2016. However, Plaintiff has not alleged a scheme to defraud. Plaintiff alleges Defendants intentionally defrauded him, as they allegedly knew the requests for money were fraudulent. *See Advocacy Org.*, 176 F.3d at 322. And, that intentional fraud induced Plaintiff to both pay money and give up his legal rights, namely settling the custody dispute. However, Plaintiff's claims of mail and wire fraud must fail because the scheme, as alleged, did not succeed. Although Plaintiff alleges he paid at least $200,000 of the agreed-upon amount, the "deal including the $400,000.00 payment fell through." (Doc. 46 ¶ 43.) As a result, this allegation cannot constitute a scheme to defraud, as it did not "accomplish[] the end designed." *Riverview Health*, 601 F.3d at 513.

Further, Plaintiff's allegations regarding documents sent by Defendants and communication with judges also do not state a claim for mail or wire fraud, as they do not meet

18

Rule 9(b)'s heightened pleading standard. In particular, Plaintiff fails to specify what statements were false and explain why the statements were fraudulent. *See Frank*, 547 F.3d at 570.

Thus, Plaintiff has failed to allege any predicate acts of either mail or wire fraud.

### d. Extortion

Extortion is included in the definition of racketeering activity. *See* 18 U.S.C. § 1961(1). Under Tennessee law, extortion is defined as follows:

> A person commits extortion who uses coercion upon another person with the intent to:
>
> (1)    Obtain property, services, any advantage or immunity;
> (2)    Restrict unlawfully another's freedom of action; or
> (3)
>
> (A)    Impair any entity, from the free exercise or enjoyment of any right or privilege secured by the Constitution of Tennessee, the United States Constitution or the laws of the state, in an effort to obtain something of value for any entity;
> (B)    For purposes of this section, "something of value" includes, but is not limited to, a neutrality agreement, card check agreement, recognition, or other objective of a corporate campaign;
> (C)    For purposes of this section, "corporate campaign" means any organized effort to unlawfully bring pressure on an entity, other than through collective bargaining, or any other activity protected by federal law.

Tenn. Code Ann. § 39-14-112(a). "Coercion," as used in the statute, is defined as a "threat, however communicated, to (A) commit any offense, (B) wrongfully accuse any person of any offense, (C) expose any person to hatred, contempt or ridicule, (D) harm the credit or business repute of any person, or (E) take or withhold action as a public servant or cause a public servant to take or withhold action." Tenn. Code Ann. § 39-11-106(a)(4). Under federal law, extortion "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Plaintiff argues he alleged extortion under both Tennessee and federal law through his allegations that Defendants offered to sell him unsupervised parenting time. (Doc. 63 at 19.) This offer was made in a proposed settlement order, as part of negotiations to settle the custody dispute. (Doc. 46 ¶¶ 60–61.) Plaintiff does not plausibly allege extortion under Tennessee law, as there are no allegations that Defendants threatened to commit an offense, wrongfully accuse someone of an offense, expose anyone to hatred, contempt or ridicule, harm anyone's reputation, or take or withhold any action as a public servant or cause a public servant to take or withhold action. *See* Tenn. Code Ann. § 39-11-106(a)(4). Additionally, as to federal extortion, Plaintiff has not plausibly alleged the offers involved threats of force, violence, or fear, or the taking of property under color of official right. *See* 18 U.S.C. § 1951(b)(2). Plaintiff's allegations of the offer to sell parenting time are not extortion, and therefore they also are not predicate acts for his RICO claim.

In sum, Plaintiff has failed to allege any predicate acts of racketeering activity, as required to show a pattern. As Plaintiff fails to allege this element of a civil RICO claim, Plaintiff's RICO claim under 18 U.S.C. § 1962(c) will be **DISMISSED**. The Court turns next to Plaintiff's claim under 18 U.S.C. § 1962(d), alleging a RICO conspiracy.

### 2.     18 U.S.C. § 1962(d)

Section 1962(d) makes it unlawful for any person to conspire to violate subsections (a) through (c) of the RICO statute. 18 U.S.C. § 1962(d). However, a RICO conspiracy claim fails if the underlying RICO claims fail. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990) (holding the "[p]laintiffs' conspiracy claim cannot stand in light of the dismissal of their other RICO counts"). Accordingly, Plaintiff's RICO conspiracy claim fails based on the Court's dismissal of his underlying RICO claims. *See supra* § III(E)(1). Thus, the Court will **DISMISS** Plaintiff's 18 U.S.C. § 1962(d) claim.

### E. 42 U.S.C. § 1983 Claim

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must set forth "facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988). The second element, under the color of state law, "has consistently been treated as the same thing as the 'state action' requirement under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794 n.7 (1996).

Plaintiff has asserted a § 1983 claim against Defendants, claiming they, in conspiracy with various state actors, violated his due process rights and deprived him of his right to self-determination of medical providers. (Doc. 46 ¶¶ 511–33.) Defendants argue Plaintiff has failed to provide any factual basis that they acted under the color of state law.[6] (Doc. 60 at 14–16.) In response, Plaintiff asserts the state-action requirement is satisfied because Defendants conspired with public officials. (Doc. 63 at 20–21.)

As an initial matter, it is undisputed that Defendants are private citizens. Section 1983 claims may be brought against individuals as private citizens, but state action still must be alleged. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). "The principal inquiry in determining whether a private party's actions constitute 'state action' . . . is whether the party's actions may be 'fairly attributable to the state.'" *Id.* (quoting *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).

---

[6] Because the state-action element is outcome determinative, the Court need not address whether Plaintiff has sufficiently alleged the deprivation of a federal right. *See Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991) ("Absent either element, a section 1983 claim will not lie.").

Case 3:19-cv-00185-CLC-DCP   Document 65   Filed 07/27/21   Page 21 of 30   PageID #: 1182

Plaintiff argues Defendants' conduct as private citizens is fairly attributable to the state as it amounted to a conspiracy with public officials. "Private persons may be held liable under § 1983 if they willfully participate in joint action with state agents." *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004); *see also Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983 . . . ."). To plead a conspiracy between government officials and private actors, a plaintiff must allege "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). However, "[i]t is well-settled that conspiracy claims must be [pleaded] with some degree of specificity and that vague and conclusive allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff asserts Defendants conspired with three state officials "to secure court orders restricting co-parenting between N and [Plaintiff] and to deny [Plaintiff] of his Constitutional rights." (Doc. 63 at 20–21.) First, Plaintiff alleges Judge Humphrey was called as a character witness on September 3, 2013, for Nelson's emergency motion to restrict co-parenting with Plaintiff. (Doc. 46 ¶ 557.) Second, Plaintiff alleges Defendants used Judge Brewer[7] to secure the orders regarding Plaintiff's parenting time. (*Id.* ¶ 551.) Finally, Plaintiff alleges Nelson, with

---

[7] Plaintiff also asserts Valone had an *ex parte* phone call with Judge Brewer during the state-court dispute. (Doc. 63 at 20.) However, that allegation does not show state action as to Defendants because it concerns only Valone, who has been dismissed from this lawsuit. (Docs. 56, 57.) Even if Defendants also participated in this conduct, the Court already decided this allegation was insufficient to establish state action. (*See* Doc. 56 at 27–29.)

whom Defendants conspired, used her position and state resources to obtain the orders. (*Id.* ¶¶ 548–51.)

These three allegations do not establish state action based on conspiracy. As a whole, Plaintiff has alleged no facts to suggest a single plan, or any plan, existed to deprive Plaintiff of his constitutional rights. As to both judges, Plaintiff presents no facts to suggest the judges actually conspired in any way with Defendants; instead, he simply states Defendants "conspired" with the judges and makes speculative arguments that certain outcomes would not have occurred "[a]bsent conspiracy with the Judge." (*See* Doc. 46 ¶ 550–554.) The Court need not accept these bare legal conclusions as true. *See Papasan*, 478 U.S. at 286.

As to Judge Humphrey, while Plaintiff alleges Judge Humphrey was improperly subpoenaed, Plaintiff does not allege the improper subpoena violated his constitutional rights, nor does he allege Judge Humphrey was aware either of the improper subpoena or of a plan to violate Plaintiff's rights.[8] And as to Defendants' conduct in obtaining that subpoena, private attorneys do not become state actors for § 1983 purposes simply by issuing a subpoena. *Hahn v. Star Bank*, 190 F.3d 708, 717 (6th Cir. 1999).

Turning to Judge Brewer and Defendants' efforts to obtain court orders from him, an attorney representing a party does not act under the color of state law merely by bringing or defending a matter in a state court. *See Dodson*, 454 U.S. at 318 ("[A] lawyer representing a client is not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983."); *Smith v. Hilltop Basic Res., Inc.*, 99 F. App'x 644, 646 (6th Cir. 2004)

---

[8] Plaintiff twice alleges Judge Humphrey testified regarding an emergency motion after he was not properly subpoenaed. (*Id.* ¶¶ 91, 557.) However, it is unclear whether these allegations are that a subpoena was improperly issued or that no subpoena was issued. Taking all inferences in favor of Plaintiff, the Court assumes Plaintiff's allegation is that a subpoena was improperly issued for Judge Humphrey's testimony.

23

(quoting *Hoai v. Vo*, 935 F.2d 308, 313 (D.C. Cir. 1991) ("[M]ere recourse to state or local court procedures does not by itself constitute 'joint activity' with the state sufficient to subject a private party to liability under section 1983 . . . .")). As a result, Plaintiff's broad allegations regarding how Defendants obtained a court order from Judge Brewer do not allege state action.

Finally, regarding Nelson, the Court already rejected the argument that Nelson's use of state resources established state action. (*See* Doc. 56 at 29–30.)

In sum, Plaintiff has failed to allege state action based on a conspiracy between Defendants and state officials. Plaintiff therefore has failed to demonstrate Defendants engaged in conduct under the color of state law and, as a result, fails to state a claim for relief under § 1983. Accordingly, Plaintiff's § 1983 claim will be **DISMISSED**.

### G.      42 U.S.C. § 1985 Claims

Section 1985 prohibits conspiracies to deprive persons of certain civil rights on account of their membership in a protected class. *See* 42 U.S.C. § 1985. Plaintiff has asserted a violation of both clauses of 42 U.S.C. §§ 1985(2) and a violation of 42 U.S.C. § 1985(3). (Doc. 46 ¶¶ 534–45.)

The first clause of § 1985(2) "prohibits conspiracies to influence parties, witnesses, or jurors in *federal* court proceedings." *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006) (emphasis added). Plaintiff alleges a conspiracy only as to state-court proceedings, so the first clause of § 1985(2) cannot apply.

The second clause of § 1985(2) and § 1985(3) share a common element: a racial or otherwise class-based discriminatory animus. *See id.* Specifically,

> [u]nder both the second clause of § 1985(2), which prohibits conspiracies to interfere with due process in state courts with the intent to deprive persons of their equal protection rights, and § 1985(3), which prohibits conspiracies to deprive persons of their equal protection rights, a plaintiff must allege that there was "some

24

> racial, or perhaps otherwise class-based, invidiously discriminatory animus behind
> the conspirators' action."

*Id.* (quoting *Kush v. Rutledge*, 460 U.S. 719, 726 (1983)). At no point does Plaintiff allege
Defendants' actions were based on racial animus, were class-based, or even that Plaintiff is a
member of a protected class.

Plaintiff has failed to state a claim under either § 1985(2) or § 1985(3), so the Court will
**DISMISS** Plaintiff's § 1985 claims.

## H. Tortious Interference and Attempted Interference with Parental Rights

Both the United States and Tennessee Constitutions encompass a fundamental right for
parents to the care, custody, and control of their children. *See Hawk v. Hawk*, 855 S.W.2d 573,
579 (Tenn. 1993) (holding "parental rights constitute a fundamental liberty under . . . the
Tennessee Constitution"); *see also Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and
Mary*, 268 U.S. 510, 534–35 (1925) (recognizing "liberty of parents and guardians to direct the
upbringing and education of children under their control" under the U.S. Constitution). This right,
however, is protected only from "unwarranted *state* intervention." *Hawk*, 855 S.W.2d at 579
(emphasis added). As a result, to state a claim for tortious interference with parental rights, a
plaintiff must allege state action. *See Alston v. Advanced Brands & Imp. Co.*, 494 F.3d 562, 565
(6th Cir. 2007) (highlighting district court's notation that it was unaware of any legal authority
supporting an interference-with-parental-rights claim based on private parties attempting to
influence the plaintiffs' children).

Defendants contend Plaintiff has not alleged state action. (Doc. 60 at 16–17.) Plaintiff
responds that state action is not required for this tort and, even if required, he did allege it. (Doc.
63 at 2–4.)

25

To begin, the Court cannot accept Plaintiff's argument that state action is not required. *See Hawk*, 855 S.W.2d at 579; *Alston*, 494 F.3d at 565. Next, Plaintiff cites Paragraphs 90 to 96 and 557 to 558 of his Amended Complaint to argue he pleaded state action. (Doc. 63 at 2–4.) These paragraphs generally concern two allegations.

First, Plaintiff alleges Judge Humphrey testified without being properly subpoenaed. (Doc. 46 ¶¶ 91, 557–558.) However, Plaintiff does not allege the advice or testimony occurred in Judge Humphrey's capacity as a state official. In addition, there is no allegation that Judge Humphrey's actions actually caused state interference with Plaintiff's right to parent. Thus, Plaintiff's allegations regarding Judge Humphrey do not establish state action.

Second, Plaintiff alleges Defendants used Judge Humphrey and Judge Brewer "to secure court orders to restrict co-parenting between N and Plaintiff." (Doc. 46 ¶ 558; *see also id.* ¶¶ 90–96.) Plaintiff, however, fails to allege these orders were unwarranted. *See Hawk*, 855 S.W.2d at 579. "Unwarranted" means "lacking adequate or official support." *Unwarranted*, *Webster's New Int'l Dictionary* (3d ed. 1993). Plaintiff argues he has alleged the orders were unwarranted (*see* Doc. 63 at 4 (citing Doc. 46 ¶¶ 16–19, 40–41, 70, 84, 109, 557–58)), but none of these paragraphs actually does so.

To begin, Plaintiff alleges "Defendants do not really believe supervised co-parenting between [Plaintiff] and his son is necessary to protect N or in his best interests." (Doc. 46 ¶ 109.) Defendants' belief regarding parenting time does not establish whether the state court's order restricting parenting time was without support, however. Next, Plaintiff alleges he agreed to pay Defendants $400,000 in exchange for unsupervised parenting time. An allegation of willingness to exchange parenting time for money is not an allegation an order lacked adequate or official support. Stated differently, the state-court orders still may have had some basis in fact despite the

26

ongoing negotiations. Finally, Plaintiff alleges he and N had some unsupervised parenting time shortly after the deal was negotiated with Defendants. Likewise, an allegation that Plaintiff had unsupervised parenting time is not an allegation that the court's actions later on were without support. As Plaintiff has failed to allege that the court orders were unwarranted, he has failed to show unwarranted state action as to his parental rights.

Plaintiff therefore cannot establish a claim for tortious interference with his parental rights. Accordingly, the Court will **DISMISS** Plaintiff's claims for tortious interference and attempted interference with parental rights.

The Court has now addressed and dismissed all of Plaintiff's federal claims, so Plaintiff's only remaining claims are ones under Tennessee law.

I.      **State-Law Claims**

Plaintiff's only remaining claims are state-law claims.[9] Plaintiff's claims were brought pursuant to 28 U.S.C. §§ 1331 and 1367. (Doc. 46.) As there is no diversity of citizenship between the parties, (*id.*), the Court has subject matter jurisdiction over Plaintiff's state-law claims only if supplemental jurisdiction exists. *See* 28 U.S.C. § 1367(a). Supplemental jurisdiction exists if a claim "form[s] part of the same case or controversy under Article III of the United States Constitution" as the claim over which the Court has original jurisdiction. *Id.* "Claims form part of the same case or controversy when they 'derive from a common nucleus of operative facts.'"

---

[9] Plaintiff's state-law claims include: (1) extortion, attempted extortion, and conspiracy to commit extortion (Doc. 46 ¶¶ 319–26); (2) blackmail and conspiracy to commit blackmail (*id.* ¶¶ 389–94); (3) coercion, duress, or undue influence (*id.* ¶¶ 356–58); (4) intentional infliction of emotional distress (*id.* ¶¶ 327–41); (5) abuse of process and conspiracy to commit abuse of process (*id.* ¶¶ 359–81); (6) fraud and conspiracy to commit fraud (*id.* ¶¶ 382–88); and (7) civil conspiracy (*id.* ¶¶ 348–55).

27

*Blakely v. United States*, 276 F.3d 853, 861 (6th Cir. 2002) (quoting *Ahearn v. Charter Twp. of Bloomfield*, 100 F.3d 451, 454–55 (6th Cir. 1996)).

Plaintiff's state-law claims derive from a common nucleus of operative facts as Plaintiff's jurisdiction-invoking claims, but even if a claim satisfies this prerequisite, the exercise of supplemental jurisdiction is discretionary. A district court may decline to exercise supplemental jurisdiction over a claim in the following circumstances:

(1)  the claim raises a novel or complex issue of State law,
(2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3)  the district court has dismissed all claims over which it has original jurisdiction, or
(4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction over a claim, a district court should weigh "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

The third rationale of § 1367(c) applies here because the Court has dismissed all of Plaintiff's claims against Defendants over which it had original jurisdiction. *See* supra §§ III(D)–(H). When all federal claims have been dismissed, the preferred disposition of state-law claims is dismissal, or, where a case has come into federal court on removal, remand to state court. *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010). A federal district court should only exercise its discretion to retain supplemental jurisdiction after dismissing federal claims under limited circumstances, which frequently involve some degree of forum manipulation. *See Carnegie-Mellon Univ.*, 484 U.S. at 357. There is neither an indication of manipulative tactics nor

28

another compelling reason for the Court to exercise supplemental jurisdiction over Plaintiff's state-law claims.

The Court declines to exercise subject matter jurisdiction over Plaintiff's remaining state-law claims, so those claims will be **DISMISSED**. As a result, Plaintiff has no claims remaining against Defendants or in this lawsuit.

### J.    Plaintiff's Request to Amend

In Plaintiff's response, he argues that the Court should allow him to amend his claims, rather than dismiss them. (Doc. 63 at 17.) Under Rule 15 of the Federal Rules of Civil Procedure, parties have a right to amend a pleading within twenty-one days of service of the pleading or twenty-one days after service of a responsive pleading or Rule 12(b) motion. Fed. R. Civ. P. 15(a). Beyond those twenty-one days, parties do not have an absolute right to amend a pleading. *See* Fed. R. Civ. P. 15(a)(2). Rather, the decision to permit a party to amend a pleading is in the Court's discretion, and leave to amend should be "freely give[n] . . . when justice so requires." *Id.* The Court may deny leave to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Court concludes Plaintiff should not be given leave to amend any of his allegations. Plaintiff already was given an opportunity to amend his complaint (*see* Doc. 45) and to provide a more definite statement as to his civil RICO claim (Doc. 34). The Court also finds Defendants would be subject to undue prejudice if Plaintiff were permitted to amend his complaint once again. When Plaintiff was first granted the opportunity to amend his complaint, only Nelson had filed an answer, and the other Defendants consented to the amendment. (*See* Doc. 41.) At the time of

Plaintiff's second request to amend, Nelson and Valone have been dismissed, and Defendants have moved for a judgment on the pleadings. To allow Plaintiff to amend would prejudice Defendants as they would, once again, be required to evaluate Plaintiff's claims against them and either file an answer or motion under Rule 12. Thus, the Court declines to provide Plaintiff with another opportunity to amend his complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motion for a judgment on the pleadings (Doc. 59) and **DISMISS** Plaintiff's claims against Defendants. As Plaintiff has no claims remaining, the Court will **DISMISS** this action **WITH PREJUDICE**.

**AN APPROPRIATE ORDER WILL ENTER.**

**/s/**
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**